IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TODD L. DEWHURST, | ) | Case No. 3:22-CV-1641 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Todd L. Dewhurst, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. Dewhurst challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in evaluating the medical opinion evidence and that the evidence supported greater mental functioning limitations. Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Dewhurst's application for DIB be affirmed.

**I.      Procedural History**

On December 11, 2020, Dewhurst applied for DIB.  (Tr. 692).  Dewhurst alleged that he became disabled on November 20, 2020 due to "bipolar disorder type 1 mixed, rapid cycling" and generalized anxiety disorder ("GAD").  (Tr. 725, 775).  The Social Security Administration denied his application initially and upon reconsideration.  (Tr. 578-586, 588-595).

On August 23, 2021, ALJ Jennifer Overstreet heard Dewhurst's case telephonically and denied his application in a September 1, 2021 decision. (Tr. 524-540, 547-577). In doing so, the ALJ determined at Step Four of the sequential evaluation process that Dewhurst had the RFC to perform a full range of work, with the following limitations:

> [Dewhurst] is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work. He is limited to occasional changes in the workplace that are well explained. He is limited to occasional interaction with supervisors, coworkers, and the general public.

(Tr. 529).

On July 25, 2022, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). And, on September 15, 2022, Dewhurst filed a complaint to obtain judicial review. ECF Doc. 1.[1]

**II.     Evidence**

    **A.     Personal, Educational, and Vocational Evidence**

Dewhurst was born on October 14, 1968 and was 52 years old on the alleged onset date. (Tr. 721). He completed college and had previously worked as a teacher, retail manager, jail worker, and in food service, but the ALJ determined he was unable to perform any past work. (Tr. 538, 726).

Additionally, Dewhurst submitted a work history report and accompanying letter. (Tr. 757-762). His letter indicated that his supervisors had noted his difficulty personality in his job performance evaluations, and he's had 15 employers in the preceding 3 years, attributing his repetitive terminations to his poor executive functioning and inability to do "any administrative task on a full time basis." (Tr. 762).

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

B.     Relevant Medical Evidence

Dewhurst limited his challenge to the ALJ's evaluation of the medical opinions and their implications for the RFC, all of which specifically related to his mental health conditions; thus, it is only necessary to summarize the evidence related to his mental health.  *See generally* ECF Doc. 7.  Due to the nature of Dewhurst's conditions, some records pre-dating the alleged onset date have been included for context.

On September 24, 2020, Dewhurst was seen at Rescue Inc. for emergency services. (Tr. 867).  Dewhurst indicated he was manic, experiencing suicidal ideations, and had impulsivity, anxiety, and racing thoughts.  *Id.*  He noted that he struggled at his last position due to his bipolar disorder and, in his current position with Big Lots, he was successful but experiencing impulsive behaviors that were starting to affect his performance, such as obtaining customers' phone numbers.  *Id.*  In addition to a prior suicide attempt in 1993, he noted receiving in-patient psychiatric treatment while in the military, being medically discharged for bipolar disorder, and having a bench warrant for traffic violations.  *Id.*  He also reported having a good relationship with his ex-wife and an "okay" relationship with his family, but described himself as a "lone wolf."  (Tr. 870).

Dewhurst was observed to present with symptoms congruent with mania, and he reported feeling euphoric with "an undertone" of depression and having suicidal ideations, anxiety, and sleep issues.  *Id.*  Dewhurst was also observed to be appropriately dressed, cooperative, and have normal speech; an anxious, depressed, and euphoric mood; a congruent affect; a full range; a racing, logical thought process; impaired attention/concentration; and average intelligence. (Tr. 867-868).  He was taking Depakote and Lexapro, and had previously been diagnosed with

3

bipolar 1 disorder with mixed features and GAD. (Tr. 869, 871-872). He was directed to a hospital for in-patient treatment. (Tr. 879).

Later that day, Dewhurst was admitted to the hospital for treatment. (Tr. 886). He had been off of his Depakote for several days, was sleeping only an hour a night at most, and had racing thoughts. *Id.* He also noted recent suicidal thoughts, outside stressors, and trouble getting his medication. *Id.* Dewhurst was treated for anxiety, with the goal being for him to learn three calming skills within three days. (Tr. 887). It was also noted that he had distorted perceptions "exhibited by impaired judgment and insight" that were evidenced by increased in anxiety and impulsivity. (Tr. 888). The treatment goal was for Dewhurst to discuss at least one negative outcome experienced related to his delusions within three days, and, in the long-term, discuss and demonstrated two effective coping skills. *Id.*

On September 25, 2020, the following day, Dewhurst was observed to be cooperative, alert, and oriented, and as having a flat affect, increased psychomotor activity, racing thoughts, pressured speech and "flight of ideas," a fair memory, average intelligence, superficial judgment, and partial insight. (Tr. 889). He also expressed feelings of helplessness, hopelessness, and suicide. *Id.* They continued working with him on his coping mechanisms and goals. (Tr. 888-901). That evening, his mental status was largely the same, but his affect was blunted, and his thought process was circumstantial. (*See* Tr. 902).

Dewhurst remained in the hospital until October 6. (Tr. 987). Throughout that period, he was treated for his anxiety and altered thought processes. (Tr. 903-987). He, generally, appeared to be stabilizing while hospitalized, noting he felt safe there, and, although there was some fluctuation, his depression and anxiety gradually reduced, with him rating them as 1/10 the day before his discharge. (*See, e.g.*, Tr. 907, 912, 939, 972, 977). His mental status

4

examinations also showed some fluctuation in his affect, mood, and thought processes, but he was, generally, fully oriented, having adequate memory, and poor insight and judgment, which eventually improved to partial insight and superficial judgment. (*See, e.g.*, Tr. 907, 921, 930, 937, 951, 960-961, 968, 977). Generally, he also had a flat or superficial affect, a labile or dysphoric mood, a disorganized thought process, and an impaired cognition. *Id.*

On December 14, 2020, Dewhurst was seen by Howard Shapiro, M.D., regarding his mental health. (Tr. 1144-1145). Dewhurst reported feeling more unstable over the past two weeks, having both manic and depressive symptoms, including reduced sleep, a "short fuse," and one day of suicidal ideation. (Tr. 1144). Dr. Shapiro observed that Dewhurst's speech was clear but overly productive, he had a coherent thought process, denied current suicidal thoughts, and appeared to have a mildly anxious but congruent affect. *Id.* His impression was that Dewhurst had a bipolar episode due to some triggering factors, such as him losing a job and changing his diet. *Id.* He recommended discontinuing Dewhurst's quetiapine, starting lurasidone, and continuing his Depakote and escitalopram. *Id.*

On December 28, 2020, Dewhurst went to the VA facility for psychiatric care. (Tr. 1139). He reported doing well under Dr. Shapiro's care, that his mood had dramatically improved, and he was no longer experiencing any of the negative thoughts or emotions he had been. (Tr. 1141). He reported a reduction in financial stress as well. *Id.* During a mental status exam, he was observed to be alert and fully oriented, and have normal speech, a euthymic mood, a congruent affect, a logical and coherent thought process, fair insight, no reported difficulty with concentration, and no alterations in thought content. (Tr. 1142).

On January 19, 2021, Dewhurst saw Dr. Shapiro. (Tr. 1123). He reported doing better and tolerating the lurasidone well, indicating he felt there had been a significant improvement in

his irritability, agitation, and sleep. *Id.* He was very involved with his kids, had started online dating, thought his exercise program at a gym helped, and noted reduced financial stress. *Id.* Dr. Shapiro noted that Dewhurst was neatly dressed, had normal speech, a coherent thought process, a pleasant affect, and no ideations or delusional thinking. (Tr. 1123-1124). His impression was that Dewhurst's bipolar disorder had improved "without significant insomnia, agitation" and continued his medication. (Tr. 1124).

On February 1, 2021, Dewhurst had a tele-health visit with Dr. Shapiro, reporting increased symptoms, specifically an increase in issues sleeping and feeling "punchy" and irritable. (Tr. 1117). Dr. Shapiro instructed him to increase his lurasidone dosage, continue his other medications, and contact him if his symptoms did not improve. *Id.*

On February 14, 2021, Dewhurst went to the emergency room with complaints of worsening manic and depression symptoms that had developed over the last two weeks. (Tr. 1042). He indicated he had not slept for the prior 24 hours, felt distractible and impulsive, and had increased self-esteem, increased activities, racing thoughts, and poor sleep. *Id.* He also endorsed having a low mood, decreased interest in activities, feelings of guilt, decreased energy, and poor concentration. *Id.* Dewhurst reported that he still had an active warrant out for traffic violations. (Tr. 1043). It was noted that he was taking divalproex, escitalopram oxalate, folic acid, lurasidone, an omeprazole. (Tr. 1043-1044). On a mental status exam, it was observed that he was dressed appropriately, cooperative, and fully oriented, and had normal speech, an anxious mood, a dysthymic congruent affect, intact attention and memory, logical and goal-oriented thought processes, no ideations or perceptual disturbances, and fair insight and judgment. (Tr. 1044). The impression was that his symptoms were very mild and there were no significant

6

safety concerns; he was referred back to his outpatient psychiatrist. (Tr. 1049). His lurasidone medication dosage was increased and he was discharged. (Tr. 1050).

On February 16, 2021, Dewhurst called the VA's National Suicide Prevention Hotline, reported he was experiencing manic symptoms; and the telephone responder informed the VA hospital in Ann Arbor, MI that Dewhurst would be coming in, "after he finished packing." (Tr. 1095-1096).[2]

Later that day, Dewhurst spoke with Dr. Shapiro, regarding his February 14 emergency room visit. (Tr. 1095). Dr. Shapiro recommended he continue his medication and follow-up with him as planned. *Id.*

On February 17, 2021, Dewhurst had another follow-up telephonic appointment with his mental health providers. (Tr. 1093-1094). He was noted to be fully oriented and have normal speech, a euthymic mood, logical and coherent thought processes, no difficulty concentrating, no alterations in his thought content, and fair insight. (Tr. 1094).

On March 3, 2021, Dewhurst had a telephonic appointment with Dr. Shapiro. (Tr. 1187). He reported that he still experienced some ongoing insomnia, impulsive behavior, mild anxiety, and panic symptoms. *Id.* Dr. Shapiro recommended increasing his dosage of lurasidone. *Id.*

On March 15, 2021, Dewhurst had a telephonic psychiatric visit with Dr. Shapiro, noting his sleep had improved, but was not perfect, since increasing his lurasidone dosage. (Tr. 1183). He noted that his mood remained elevated, as well as his energy and denied impulsive behaviors. (Tr. 1183-1184). Dr. Shapiro reduced his escitlopram dosage, but continued his other medications. (Tr. 1184).

---

[2] Records from Dewhurst's hospital visit do not appear to have been included in the record.

On April 28, 2021, Dewhurst had a psychiatric appointment. (Tr. 1174). He reported continuing to experience panic attacks and chest pressure. (Tr. 1175). These symptoms would usually occur together, would last the majority of his day, and were usually accompanied by some sense of dread. *Id.* He was observed to be fully oriented, have normal speech, a euthymic mood, congruent affect, logical and coherent thought processes, no difficulty concentrating, fair insight, and no delusions or hallucinations. (Tr. 1176). His medications were continued. *Id.*

On May 11, 2021, Dewhurst had a telephonic appointment with Dr. Shapiro. (Tr. 1167-1168). He reported having a more depressed mood, lack of interest/motivation, reduced bathing, and increased general anxiety levels. (Tr. 1168). He reported sleeping about nine hours, but not waking up rested; and he denied any significant impulsive behaviors. *Id.* Dr. Shapiro increased his lurasidone dose and continued his other medication. *Id.*

On May 25, 2021, Dewhurst had a telephonic appointment with Dr. Shapiro. (Tr. 1166). He reported doing better, noting his sleep had improved, and that he had not had any recurrences of impulsive behavior. *Id.* Dr. Shapiro noted he was neatly dressed and had normal speech; coherent thought process; no suicidal thoughts, delusions, or hallucination; and a pleasant, reactive affect. (Tr. 1166-1167). Dr. Shapiro continued his medications. (Tr. 1167).

      **C.**    **Relevant Opinion Evidence**

           **1.**    **Mental RFC Assessment – Howard Shapiro, M.D.**

On February 16, 2021, Dr. Shapiro completed a mental RFC assessment. (Tr. 1059-1062). He noted that he began treating Dewhurst in October 2020 with approximately monthly appointments until his most recent appointment on February 1, 2021. (Tr. 1059). He diagnosed Dewhurst with bipolar 1 disorder, neprolithiosis, and assessed him with a GAF score of 50. *Id.* He gave Dewhurst a guarded prognosis and noted that Dewhurst was hospitalized in

2020, undergone psychotherapy, and received medications, including lithium, dexaportor, quetiapine, and lurasidone. *Id.* He did not believe the condition was malingering. *Id.*

Dr. Shapiro opined that, as to his understanding and memory, Dewhurst had a marked limitation in his ability to remember locations and work-like procedures and in his ability to understand and remember detailed instructions; but only had a mild limitation in his ability to understand and remember very short and simple instructions. (Tr. 1060). He also concluded that Dewhurst had the following limitations in his ability to sustain concentration and persistence: (i) a mild limitation in his ability to carry out very short and simple instructions; (ii) marked limitations in his ability to carry out detailed instructions and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (iii) an extreme limitation in his ability to maintain attention and concentration for extended periods. *Id.* Further, Dewhurst had (iv) marked limitations in his ability to work in coordination with or proximity to others without being distracted by them and to complete a normal workday and workweek without interruption from his symptoms and perform at a consistent pace without an unreasonable number or and length of rest periods; and (v) moderate limitations in his ability to sustain an ordinary routine without special supervision and to make simple work-related decision. (Tr. 1061).

As to Dewhurst's social interactions, Dr. Shapiro opined that he had marked limitations in his ability to: (i) interact appropriately with the general public, (ii) accept instructions and respond appropriately to criticism from supervisors, and (iii) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* He also found that Dewhurst had a moderate limitation in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness or cleanliness, and a mild limitation in his ability to ask simple

questions or request assistance. *Id.* As to adaptation, Dr. Shapiro found that Dewhurst had (i) a marked limitation in his ability to respond appropriately to changes in the work setting; (ii) a moderate limitation in his ability to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others; and (iii) an extreme limitation in his ability to tolerate normal levels of stress. (Tr. 1061-1062). Dr. Shapiro opined that Dewhurst's impairments would substantially interfere with his ability to work on a regular and sustained basis at least 20% of the time and he would miss work about 10 days a month. (Tr. 1062). He did not think Dewhurst could work on a regular and sustained basis because "despite treatment [Dewhurst] has ongoing, unstable, labile mood, impulsivity, poor judgment, [and a] propensity for interpersonal conflicts. He is considered to have a "mixed state" bipolar disorder with frequent shifts and overlap of depressive and manic symptoms." *Id.*

### 2. State Agency Consultants

On March 12, 2021, Cindy Matyi, Ph.D., reviewed Dewhurst's medical records for mental health limitations. (Tr. 583-584). Dr. Matyi concluded that Dewhurst was moderately limited in his ability to understand and remember detailed instructions but was otherwise not significantly limited in his understanding and memory. (Tr. 583). She specified that he could comprehend and remember simple (1 to 2 step) instructions and occasionally complex/detailed (3 to 4 step) instructions. *Id.*

Dr. Mayti further concluded that he was moderately limited in his ability to (i) carry out detailed instructions; (ii) maintain attention and concentration for extended periods; (iii) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (iv) work in coordination with or in proximity to others without being distracted by

10

them; and (v) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* In all other aspects of his ability to sustain concentration and persistence, she concluded Dewhurst was not significantly limited. *Id.* Dr. Matyi included the same clarification regarding simple and complex instructions, noting Dewhurst could also make simple decisions, adequately adhere to a schedule, and would need "a relatively isolated workstation and supervisory support when first learning job tasks." *Id.*

As to Dewhurst's ability to socially interact, Dr. Matyi concluded that he was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but was not otherwise significantly limited. (Tr. 584). She noted that Dewhurst was "socially avoidant and isolated at times[,] moody;" but he could relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny. *Id.*

As to his adaptation limitations, Dr. Matyi concluded that Dewhurst was moderately limited in his ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others but was otherwise not significantly limited. *Id.* Dr. Matyi noted Dewhurst could adapt "to a setting in which duties are routine and predictable and in which changes are infrequent, explained in advance, and introduced slowly," and would require supervisory support with goal-setting and planning. *Id.*

On April 23, 2021, Aracelis Rivera, Psy.D., reconsidered the medical evidence of Dewhurst's mental health limitations and affirmed Dr. Matyi's conclusions. (Tr. 592-594).

11

### D. Relevant Testimonial Evidence

Dewhurst testified at the hearing. (Tr. 551-567). He lived alone with his son, and he'd had a driver's license, but it had been suspended due to traffic tickets. (Tr. 551-552). He believed he could not work because he had "significant issues with executive task thinking." (Tr. 557). Specifically, he was anxious, depressed, disorganized; could not stay on task; and had social anxiety, GAD, hygiene issue, and mania issues. *Id.* His ex-wife, who lived next door to him, would drive him if he needed to go anywhere and would help him care for their son. (Tr. 558). He was hospitalized in 2020 for his bipolar disorder and found his medication helpful, if he did not have any other pressures or stressors. (Tr. 558-559). He still had issues with anxiety and excessive worrying. (Tr. 559). He indicated he was in counseling, but the counselor was "more like a big brother." *Id.* He was fired from his last job because he could not show up on time, left early, would come back from lunch late, would flirt with customers, and was temperamental. (Tr. 560).

Dewhurst described his typical day as getting up around 6 am, helping his son, making his son breakfast and getting him off to school, and then deciding whether he wanted to stay up or go back to bed. (Tr. 561). He would try to stay up with a cup of coffee, read, and spend time pacing, before getting himself lunch and continuing to read or pace. *Id.* When his son came home, he would help him with homework and then try to sleep. *Id.* He described that he was too unmotivated or depressed to take a shower every day, brush his teeth everyday, clean, or do things. (Tr. 562-564). His conditions also affected his weight, as his eating habits were "out of whack," and made his sleep erratic, caused concentration issues, and "on and off" suicidal thoughts. (Tr. 562, 565-566). When he was having an anxiety attack, he indicated that it felt like being claustrophobic outside of an elevator. (Tr. 563). These attacks would happen almost

daily, would last anywhere from 30 minutes to 5 hours, and would make it hard for him to leave his house. (Tr. 563-564). His conditions had also hurt his relationships, causing his divorce and for him to be moody and temperamental at work. (Tr. 564-565).

### III. Law & Analysis

#### A. Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009). Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

#### B. Step Four: Residual Functional Capacity

Dewhurst contends that the ALJ erred in rejecting the medical opinion evidence and failed to consider the record as a whole which supported greater mental functioning limitations. ECF Doc. 7 at 17. He argues that the ALJ's review of the medical records in support of her finding that the opinions were only "somewhat persuasive" "does not provide a full picture," arguing that his improvement with medication was only temporary, that his daily activities

13

fluctuated with the temporary improvement, and that the ALJ failed to address his multiple, short-term jobs. ECF Doc. 7 at 21-22. Moreover, he argues the ALJ failed to address the degree of improvement. ECF Doc. 7 at 23. The Commissioner disagrees. *See* ECF Doc. 8. In his reply brief, Dewhurst largely repeated his arguments. *See* ECF Doc. 10.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 WL 374184 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 WL 374184.

As part of the Step Four analysis, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2)[3]. According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

14

relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  See 20 C.F.R. § 404.1520c(c)(1)-(2).

       The ALJ applied the correct legal standards and reached a conclusion as to the medical opinions supported by substantial evidence.  *Blakley*, 581 F.3d at 405.  The ALJ met her obligations under 20 C.F.R. § 404.1520c(c) by identifying and discussing those factors supporting Dr. Shapiro's and the state agency consultants' opinions and any inconsistencies with the other medical evidence.  (*See* Tr. 534-538).  Although the ALJ did not flag her reasoning by using the regulatory words "supportability" and "consistency," in reading the decision as a whole and with common sense, the ALJ's reasoning as to those factors is clear.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").

       Specifically, as to Dr. Shapiro, the ALJ explained that she found Dr. Shapiro's opinions that Dewhurst had marked and extreme limitations in areas of mental functioning and on absenteeism to be unpersuasive.  (Tr. 534).  And then the ALJ proceeded to identify Dr. Shapiro's own records and other medical evidence that was inconsistent with Dr. Shapiro's opinion.  (*See* Tr. 534-536).  For example, the ALJ identified that: (1) Dewhurst, although hospitalized during the relevant period, only exhibited mild symptoms; (2) Dewhurst's treatment records, including those by Dr. Shapiro, identified only mild symptoms.  And Dewhurst was found to be fully oriented, had logical and coherent thought processes, and had no difficulty concentrating, (*see* Tr. 535 *citing* Tr. 1093-1095, 1123, 1166-1167); and (3) medical records indicated Dewhurst had engaged in normal daily activities and social interactions, such as going to the gym, dating online, and having a close relationship with his ex-wife and children (*see* Tr.

870, 1123). *Id.* Thus, although the ALJ did not characterize her summary of the evidence in terms of "consistency" and "supportability," her citations to Dr. Shapiro's own records and other medical evidence and her discussion of how she found them contrary to Dr. Shapiro's opinions, met her regulatory obligations under 20 C.F.R. § 416.920c(c). *See Blakley*, 581 F.3d at 405.

Substantial evidence supports the ALJ's decision to find Dr. Shapiro's opinion only somewhat persuasive. Such evidence includes: (i) treatment notes, including his own, indicating that Dewhurst was alert, was fully oriented, had an intact memory, had a coherent thought process, or had no concentration issues, (*see* Tr. 1044, 1094, 1123-1124, 1142, 1144, 1166-1167, 1176); (ii) Dewhurst's statements that he was engaged with his kids, had a good relationship with his former wife, and was dating online, (*see* Tr. 870, 1123); (iii) the lack of any missed appointments, and (iv) Dewhurst's ability to live alone and participate in a gym program (Tr. 551, 1123). *See Blakely*, 581 F.3d at 406.

Further, even if the ALJ erred by not more explicitly discussing the supportability of Dr. Shapiro's opinion, the error was ultimately harmless. *See Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). An error in an ALJ's evaluation of the opinion evidence may be harmless in several circumstances, including when the Commissioner otherwise met the goals of the regulations by indirectly attacking the supportability or consistency of the opinion. *Wilson v. Comm's of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010).[4] As seen in the substantial evidence and the

---

[4] While the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied that analysis to the post-March 27, 2017 regulations. *See Hickman v. Comm'r of Soc. Sec.*, No. 20-CV-6030, 2021 WL 5176523, at *5 n.4 (S.D. Ohio Nov. 8, 2021); *Vaughn v. Comm'r of Soc. Sec.*, No. 20-CV-1119, 2021 WL 3056108, at *11 n.8 (W.D. Tenn. July

16

ALJ's discussion, the ALJ clearly articulated both the medical evidence – aside from Dr. Shapiro's own treatment notes – that his opinion was inconsistent with, and his own treatment notes that did not support his opinion. Accordingly, although imperfect, even if the ALJ's discussion were erroneous, such an error would be harmless because the ALJ otherwise attacked the supportability of Dr. Shapiro's opinion. *Wilson,* 378 F.3d at 547.

The ALJ followed a similar pattern her discussion of the state agency consultants' opinions. This, too, satisfied her regulatory obligation. *See Blakely*, 581 F.3d at 405. The ALJ found that the objective evidence did not support the state agency consultants' opinion that:

> [Dewhurst] would be limited to comprehending, remembering and carrying out simple, one to two step, and only occasional complex and/or detailed, three to four step instructions in a relatively isolated workstation with supervisory support when first learning job tasks or he would be limited to relating adequately on only a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers and no over-the-shoulder supervisor scrutiny in a setting where changes are infrequent and introduced solely with supervisory support with goal-setting and planning.

(Tr. 537).

The ALJ cited Dewhurst's own reports on his daily activities and relationships, as well as medical records she concluded showed that Dewhurst had normal relationships, and consistent mental status exams, indicating a coherent thought process, pleasant and reactive affect, and that Dewhurst was neatly dressed, with normal eye contact. (Tr. 536-537). She further acknowledged that there was some evidence to support finding Dewhurst to be limited in these areas, noting his irritability, impulsive behaviors, increased anxiety, and fragmented sleep, among other things. (Tr. 537-538). Accordingly, the ALJ found Dewhurst to be limited in these areas, but not to the extent opined on by the state agency consultants. *Id.*

---

20, 2021); *Burba v. Comm'r of Soc. Sec.,* No. 1:19-CV-905, 2020 WL 5792621, at *4 (N.D. Ohio Sept. 29, 2020).

Moreover, substantial evidence supports the ALJ's decision to find the state agency consultants' opinions only somewhat unpersuasive. Such evidence includes: (i) consistent mental status exams indicating Dewhurst had a logical, coherent thought process; had no focus or concentration issues; or had fair insight (Tr. 1044, 1094, 1123-1124, 1142, 1144, 1166-1167, 1176); (ii) Dewhurst's testimony that he had a good relationship with his ex-wife, he was online dating, he participated at a gym, and he was involved with his kids (Tr. 870, 1123). *See Blakely*, 581 F.3d at 406.

Dewhurst alleged that, in addition to misevaluating the medical opinions, the ALJ failed to consider the opinions in light of the medical record as a whole, without any citations to medical evidence he contends the ALJ ignored. *See* ECF Doc. 7. Further, he summarily asserts in reply that "the ALJ's decision focused almost exclusively on the evidence that supported her foregone conclusion." *See* ECF Doc. 10 at 4-5. As a result, Dewhurst's argument that the ALJ's analysis only picked up on the temporary improvements in Dewhurst's condition is really a call for the court to reweight the medical evidence. This we cannot do. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (recognizing that under the substantial evidence standard the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.").

Moreover, Dewhurst alleged that the ALJ should have considered his varied work history in evaluating his limitations. But the ALJ did this very thing in summarizing Dewhurst's subjective complaints and testimony. She noted: (i) a letter in which Dewhurst attributed his inability to maintain meaningful employment to his mental health limitations; (ii) Dewhurst's personnel files, which indicated he had a difficult personality, and (iii) the fact that he'd had 15 employers in the preceding 3 years. (*See* Tr. 530). And in doing so, the ALJ cited to Dewhurst's work history report. (*See* Tr. 530 *citing* Tr. 761-762). As such, the ALJ plainly considered

Dewhurst's work history in making her evaluation of his disability.  The ALJ's failure to restate or refer to that evidence in later portions of the same RFC discussion provides no basis for remand.  See *Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 819 (6th Cir. 2020) ("An ALJ need not cite every piece of evidence in the record and an ALJ's failure to cite specific evidence does not indicate it was not considered." (internal quotation marks omitted)).  Accordingly, because substantial evidence supports the ALJ's conclusion that the medical opinions were only somewhat persuasive, I recommend that the ALJ's decision be affirmed.

## IV. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Dewhurst's application for DIB be affirmed.

Dated: May 18, 2023

Thomas M. Parker
United States Magistrate Judge

---

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and

recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).